IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**FILED**
U.S. District Court
District of Kansas

FEB 7 2022

Clerk, U.S. District Court
By_____ Deputy Clerk

UNITED STATES OF AMERICA

Plaintiff,

v.

Case No. 6:21-CR-10074-01-EFM

AIROSOL COMPANY, INC.

Defendant.

**PLEA AGREEMENT PURSUANT TO FEDERAL RULE
OF CRIMINAL PROCEDURE 11(c)(1)(C)**

The United States of America, by and through Assistant United States Attorney Alan G. Metzger and the Environmental Crimes Section (ECS) Trial Attorney R.J. Powers, and Airosol Company, Inc., the defendant, by and through its authorized representative, Eugene Fleishman, President, and its counsel Gary Ayers, hereby enter into the following plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure:

1. **Defendant's Guilty Plea.** The defendant agrees to plead guilty to Count One of the Indictment charging a violation of 42 U.S.C. § 7413(c)(1) and 40 CFR Part 68, that is, Failure to Develop and Implement a Risk Management Program. By entering into this plea agreement, the defendant admits to knowingly committing the offense, and to being guilty of the offense. The defendant understands that the maximum sentence which may be imposed as to Count One of the Indictment is not more than 5 years of probation, a $500,000.00 fine (or not more than the greater of twice the gross gain or twice the gross loss), and a $100.00 mandatory special assessment.

2. **Factual Basis for the Guilty Plea.** The parties agree the facts constituting the offense to which the defendant is pleading guilty are as follows:

Airosol Company, Inc. (Airosol) is a manufacturer and packager of aerosols and liquid products. It is a privately held company since it was incorporated in 1949, employing between 35 – 40 individuals.

The Airosol facility occupies two city blocks in Neodesha, Kansas consisting of an administration building, a production facility and a storage site. The property is located within a commercial manufacturing and warehouse use area with common utility services and paved streets. Airosol's manufacturing process consists of a can filling room, a propellant room where propellant is added to the product, and a capping, labeling, and boxing operation.

Raw chemicals which are the ingredients for Airosol products are delivered to the facility by tanker trucks, totes or barrels and are stored in large tanks or in the warehouse to the facility. Among these chemical ingredients are isobutene, propane, ethyl ether, and pentane, which Airosol stores and/or uses in amounts over 10,000 lbs. As such, the processes that involve these highly flammable substances fall under the Clean Air Act's Accidental Release Prevention and Mitigation Program, 42 U.S.C. § 7412(r) and its supporting regulations, 40 CFR Part 68. These federal laws require Airosol, to, among other things, create and implement a risk management plan (RMP) to detect and prevent or minimize any accidental releases of designated hazardous substances and provide a prompt emergency response in order to protect human health and the environment. Airosol is further required to submit an RMP report to the United States Environmental Protection Agency (EPA) documenting the creation and implementation of its plan, and update that report every 5 years. Airosol filed its first RMP report in February 2000, then followed with updates in December 2005, December 2010, and October 2016.

Additional requirements imposed by 40 CFR Part 68 on an owner or operator of a stationary source like Airosol depends on which of three program levels the specific process involving the listed substance falls under. Level 1 has the fewest requirements. Level 3 the most. If a manufacturing process is also covered by OSHA's Process System Management (PSM) standards, 29 CFR 1910.119, it is designated a Level 3 Program. In each of the RMP Reports Airosol filed with the EPA, the company indicated that it was covered by PSM and that it operated two separate covered processes at its facility in Neodesha: warehouse storage, which is a Program Level 1 process, and the filling of aerosol cans, which is a Program Level 3 process. However, Airosol listed only three hazardous chemicals used in those two covered processes: isobutane, propane, and ethyl ether. It failed to report the presence and use of pentane in each of the filed RMP reports.

In the early morning of November 22, 2016, a fire and explosion occurred at the Airosol manufacturing and warehouse facility. Employees Curk Creed and William Russ Strimple were working in the mixing room, where various chemicals were blended together to make a product batch to be packaged and sold to customers. Once mixed, the product batch would be taken to a line to be put into aerosol cans. The size of the batch would depend on the customer's order. On the day before the fire, too much of one product named Albatross Dry Silicone had been made, so the batch was separated into two different 500-gallon stainless steel totes. Creed and Strimple decided to combine the totes, which was a common practice at Airosol. To accomplish this task, one tote was placed on the ground and

the other tote was raised on a forklift and positioned above. They opened the valve on the forklift tote in order to drain it into the ground tote which had no lid. The Albatross Dry Silicone being transferred contained 86% pentane, which is a hydrocarbon that has several industrial uses, including burning as fuel, using in solvents, and even found in some pesticides. After they began mixing, Creed walked over to a nearby large circular fan, and turned it on. The fan motor sparked when he flipped the switch causing an explosion and fire. As reported by Strimple, flames shot from the fan straight to the totes containing the pentane product. As a result, Creed was thrown to the other side of the room. Fortunately, Strimple was not impacted by the initial explosion since he was on top of the forklift and both employees managed to run from the room before it exploded again and was engulfed in flames. However, Creed was taken to a hospital for his burns to be treated and then flown to a hospital in Wichita, Kansas due to smoke inhalation.

The Neodesha Fire Department responded to the scene around 6:30am. As they began preparing apparatus for pumping operations and preparing for entry into the building, a second explosion occurred inside the structure

The Neodesha Fire Department requested aid from other nearby fire departments, including Fredonia, Independence and Parsons to put out the blaze. Due to extensive debris from the structure and fire, no trains could pass on the tracks nearby and Neodesha Police began evacuating the surrounding community. Neighborhood schools were closed for the day. Yellow colored water was observed spilling from the structure. Fire department officials, along with the director of public works, considered constructing dikes to keep the water from entering the storm drains, however, they felt it too dangerous due to their proximity to the continued explosions.

The firefighters used more water than the city could handle. The Neodesha's Water Department reported at the time that water pressure was dropping too fast and eventually, water had to be drawn from the Fall River. Local and downstream communities were affected. Runoff from the site entered the Fall and Verdigris Rivers, which are drinking water sources for Neodesha and downstream communities, including Independence and Coffeyville, KS and communities in Oklahoma. The Kansas Department of Health & Environment (KDHE) issued a do not use order for five communities in Wilson County, including the city of Neodesha. The Oklahoma Department of Environmental Quality (ODEQ) ordered drinking water plants downstream from the incident to shut down their inlets. The Federal Emergency Management Agency (FEMA) assisted by coordinating the provision of bottled water to the affected communities. About nine hours later, the fire still burned, but was considered under control.

On December 6-8, the OSHA Health Response Team (HRT) and staff from the Wichita Field Office conducted an inspection of the Airosol facility. In addition to other health and safety violations, Airosol could not produce any of the documents required by the OSHA PSM standard. No process safety information existed, no PHA had been performed, and there was no employee participation

program. The OSHA inspectors concluded that Airosol had no PSM program and referred Airosol for a detailed PSM review.

On February 7, 2017, OSHA CSHO Tam Le conducted the detailed PSM review of Airosol's facility. A few days prior to arriving on site, CSHO Tam Le sent a 6-page PSM Document Request to Airosol's Environmental, Health and Safety (EHS) Coordinator, Terri Settle, via email. During the opening conference, Airosol's EHS Coordinator, Ms. Settle, reported that Airosol could not produce any of the requested documents. On March 8, 2017, CSHO Le sent another email to Terri Settle asking follow-up questions. In her response, Settle admitted that not only did Airosol have no PSM program, they had no RMP either.

On August 18, 2017, EPA Region 7 Compliance Inspector Dave Browning called Terri Settle to schedule a site visit at Airosol. In his email requesting to confirm the inspection date of August 22-23, Browning included a list of RMP supporting documents he asked to be made available for his review upon arrival. Settle replied that she would not be available to meet with Browning but that Don Schull, the Plant Manager, would accompany the inspector on a walk-through of the facility and answer any of his questions.

When CI Browning arrived on site on August 22nd, he was met by Don Schull and Paula Bohannon, Airosol's Technical Director. Neither Schull nor Bohannon could provide the requested RMP supporting documents which Browning had asked Settle to make available for his review. Furthermore, over the course of the inspection, Bohannon advised CI Browning that Airosol failed to meet many of the regulatory requirements of the CAA accidental release prevention and mitigation program, 42 U.S.C. § 7412(r) to include: a) compile process safety information; b) complete a process hazard analysis; c) prepare and maintain written mechanical integrity procedures; d) document inspections of process equipment or create a frequency schedule for maintenance; prepare and maintain written management of change procedures; e) perform a pre-start-up safety review; f) perform compliance audits and; g) have a written plan for implementing employee participation in PHA or the applicable elements of process safety management. As a result of the August 22 inspection, EPA Region 7 Air Division found multiple violations of the accidental release prevention and mitigation regulations and concluded that Airosol had no RMP. If the required components of 40 CFR part 68 been implemented, and in particular, the process hazard analysis, Airosol might have identified the non-intrinsic safe fan and removed it from nearby the mixing room, thus preventing the November 22, 2016 fire.

3. **Proposed Rule 11(c)(1)(C) Sentence.** The parties propose, as an appropriate disposition of the case:

(a) A $100,000.00 fine to be paid as follows: $25,000 at or before the time of sentencing, with the balance due on or before September 30, 2022;

4

(b) A three-year term of probation. The terms of probation shall include:

- the timely payment of the fine referenced is subparagraph (a);

- the making of timely payments pursuant to the payment plan under to the Settlement Agreement for Recovery of Past Response Cost, entered into by the defendant, Airosol Company, Inc., and the United States Environment Protection Agency, a copy of which is attached hereto;

- full compliance with 42 U.S.C. 7412(r) and 40 C.F.R. Part 68;

- the completion of a Compliance Audit, by a third party approved by EPA compliance officer David Hensley (or his replacement) as identified by 40 CFR 68.79(b) with the audit to be completed on or before March 7, 2022;

- Completion of the next Process Hazard Analysis (PHA) revision completed and submitted to Dave Hensley (or his replacement) by April 25, 2022;

- Completion of the next Risk Management Program report completed and submitted by September 11, 2022;

- Until the fine set forth in paragraph 1 herein, as ultimately determined by the Court, is paid in full, and except in the ordinary course of business, Defendant agrees not to encumber, transfer, or dispose of any monies, property, or assets under defendant's custody or control, without written approval from the United States Attorney's Office or ECS. The United States will consider, in good faith, any request for the expenditure or encumbering of company assets and revenues for the purpose of maintenance and repairs, equipment purchases, and capital improvements, and if the parties cannot agree upon the requested encumbrance, the Defendant may petition the court for a modification of the terms of probation; and

5

   (c)  the mandatory special assessment of $400.00.

The parties seek this binding plea agreement as an appropriate disposition of the case, because if the Court permits itself to be bound by the proposed sentence, it brings certainty to the sentencing process; it assures that the defendant and the government will benefit from the bargain they have struck; it serves the interests of justice; and it assures a sentence consistent with the sentencing factors of 18 U.S.C. § 3553(a). If the Court does not agree with the sentence, the defendant and United States may be restored to the positions they maintained prior to reaching this plea Agreement. This plea agreement centers on the defendant's agreement to enter its guilty plea as soon as the Court's schedule permits, thereby preserving valuable Court, prosecution, defense, United States Probation Office, United States Marshals' Service and other law enforcement resources.

  4. **Application of the Sentencing Guidelines.** The parties are of the belief that the proposed sentence does not offend the advisory sentencing guidelines. Because this proposed sentence is sought pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), the parties are not requesting imposition of an advisory guideline sentence.

  5. **Government's Agreements.** In return for the defendant's plea of guilty as set forth herein, the United States agrees to dismiss the remaining count of the Indictment at the time of sentencing, and agrees to not file any additional charges against the defendant arising out of the facts forming the basis for the present Indictment. Specifically, the United States will dismiss Count Two of the Indictment as to Defendant Airosol.

  6. **Consequences for Violating the Plea Agreement.** The United States' obligations under this plea agreement are contingent upon the defendant's continuing to manifest an acceptance of responsibility. If an authorized representative of the defendant denies or gives conflicting statements as to its involvement, falsely denies or frivolously contests relevant conduct

the Court determines to be true, willfully obstructs or impedes the administration of justice, as defined by U.S.S.G. § 3C1.1 (or willfully attempts to do so), or has engaged in additional criminal conduct, the United States reserves the right to petition the Court for a hearing to determine if it has breached this plea agreement.

If the Court finds by a preponderance of the evidence that the defendant (1) has breached or violated this plea agreement; (2) has willfully obstructed or impeded the administration of justice, as defined by U.S.S.G. § 3C1.1 (or willfully attempted to do so); (3) has engaged in additional criminal conduct; or (4) has otherwise failed to adhere to this plea agreement's terms, this plea agreement will be deemed null and void, and the United States may pursue any additional charges arising from the criminal activity under investigation, as well as any charges for any perjury, false statement, or obstruction of justice that may have occurred.

If the Court finds the defendant has violated this plea agreement, it understands and agrees that all statements made by its authorized representative, any testimony given by its authorized representative before any tribunal, or any leads from such statements or testimony, shall be admissible against it in any and all criminal proceedings. The defendant waives any rights which might be asserted under the United States Constitution, any statute, Federal Rule of Criminal Procedure 11(f), Federal Rule of Evidence 410, or any other federal rule that pertains to the admissibility of any statements he made subsequent to this plea agreement.

7. **Whether to Accept the Proposed Plea Agreement and Sentence is Up to the Court.** The Court has no obligation to accept the proposed plea agreement and sentence. It is solely within the Court's discretion whether to accept the proposed binding plea agreement as an appropriate disposition of the case.

8. **Withdrawal of Plea Permitted Only if the Court Does Not Accept the Plea Agreement and Proposed Sentence.** If the Court agrees to be bound by the proposed plea

agreement and sentence, the parties shall be bound by all the terms of the proposed plea agreement and the defendant will not be permitted to withdraw its guilty plea. If the Court announces that it will NOT be bound by the proposed plea agreement, the parties agree that at that time either party may withdraw the proposed plea agreement, and if either does so, then all parties will be restored to the positions they were in prior to the entry of the defendant's plea. If neither party elects to withdraw the proposed plea agreement at the time the Court announces that it will not be bound, and before the Court proceeds with sentencing, then the parties shall be bound by all the terms of the proposed plea agreement and the defendant will not be permitted to withdraw its guilty plea.

9. **Identification of Assets and Agreement Concerning Monetary Penalties (Restitution, Fines, Assessments) and Forfeiture.** The defendant, through its duly authorized representative(s), agrees to cooperate fully with the United States Attorney's Office and the ECS specifically agrees as follows:

(a) Defendant agrees to execute a financial statement provided by the United States Attorney's Office and to update the statement with any material changes within 30 days of any such change. Defendant further agrees to provide all supporting documentation, including, but not limited, to copies of federal tax returns. The defendant agrees to disclose all assets in which defendant has any interest or which defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party, as well as any transfer of assets that has taken place within six years preceding the entry of the judgment in this criminal case. Additionally, the defendant agrees to periodically execute an updated financial statement at the request of the United States Attorney's Office or ECS until such time the judgment debt is paid in full.

(b) Defendant agrees to authorize the release of all financial information requested by the United States, including, but not limited to, executing authorization forms for the United States to obtain tax information, bank account records, credit history, and social security information. Defendant agrees the United States Attorney's Office or ECS may subpoena any records it deems relevant to conduct a full financial investigation. Defendant agrees to discuss or answer any questions by the United States relating to its financial investigation.

(c) Defendant agrees that any waivers, consents, or releases executed for the United States Probation Office for purposes of preparation of the Presentence Report may be provided to the United States Attorney's Office and ECS. All information

          defendant provided to the United States Probation Office or independently obtained by the United States Probation Office may be provided to the United States Attorney's Office and ECS.

(d)     Defendant agrees not to encumber, transfer, or dispose of any monies, property, or assets under defendant's custody or control, without written approval from the United States Attorney's Office or ECS, except as provided by the agreed terms of probation.

(e)     If defendant posted funds as security for defendant's appearance in this case, defendant authorizes the Court to release the funds to the Clerk of the United States District Court to be applied to the criminal monetary impositions at the time of sentencing.

(f)     Defendant waives any requirement for demand of payment on any restitution, fine, assessment, or forfeiture judgment entered by this Court.

(g)     Defendant agrees to notify the United States Attorney's Office and ECS within 30 days of any change of address or other contact information until the judgment debt is paid in full.

(h)     Defendant agrees the terms of this agreement shall be incorporated into the Judgment in a Criminal Case.

(i)     Defendant waives the administrative requirements of the Treasury Offset Program, including the requirement of default, and agrees to be immediately included in the Treasury Offset Program allowing federal benefits and payments to be offset and applied to the balance of criminal monetary penalties.

(j)     Defendant agrees that noncompliance with any of the terms set forth in this paragraph will result in a continuance of the sentencing hearing.

10.     **Payment of Special Assessment.** The defendant understands that a mandatory special assessment of $400.00 will be entered against it at the time of sentencing. The defendant agrees to deliver to the Clerk of the United States District Court payment in the appropriate amount no later than the day of sentencing. The defendant has the burden of establishing an inability to pay the required special assessment. The parties acknowledge that if the Court finds the defendant is without resources to pay the special assessment at the time of sentencing, the Court may allow payment during his period of incarceration.

11. **Waiver of Appeal and Collateral Attack.** The defendant knowingly and voluntarily waives any right to appeal or collaterally attack any matter in connection with this prosecution, its conviction, or the components of the sentence to be imposed herein, including the length and conditions of probation, as well as any sentence imposed upon a revocation of probation. The defendant is aware that 18 U.S.C. § 3742 affords it the right to appeal the conviction and sentence imposed. By entering into this agreement, the defendant knowingly waives any right to appeal a sentence imposed in accordance with the sentence recommended by the parties under Rule 11(c)(1)(C). The defendant also waives any right to challenge its sentence, or the manner in which it was determined, or otherwise attempt to modify or change its sentence, in any collateral attack, including, but not limited to, a motion brought under 28 U.S.C. § 2255 (except as limited by *United States v. Cockerham*, 237 F.3d 1179, 1187 (10th Cir. 2001)), or a motion brought under Federal Rule of Civil Procedure 60(b). In other words, the defendant waives the right to appeal the sentence imposed in this case, except to the extent, if any, the Court imposes a sentence in excess of the sentence recommended by the parties under Rule 11(c)(1)(C). However, if the United States exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may appeal the sentence received, as authorized by 18 U.S.C. § 3742(a). Notwithstanding the foregoing waivers, the parties understand that the defendant in no way waives any subsequent claims with regards to ineffective assistance of counsel or prosecutorial misconduct.

12. **FOIA and Privacy Act Waiver.** The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552.

The defendant further waives any rights conferred under the Privacy Act of 1974, 5 U.S.C. § 552a, to prevent or object to the disclosure of records or materials pertaining to this case.

13. **Waiver of Claim for Attorney's Fees.** The defendant waives all claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

14. **Full Disclosure by United States.** The defendant understands the United States will provide to the Court and the United States Probation Office all information it deems relevant to determining the appropriate sentence in this case. This may include information concerning its background, character, and conduct, including the entirety of its criminal activities. The defendant understands these disclosures are not limited to the count to which it is pleading guilty. The United States may respond to comments made by its authorized representative or its attorney makes, or to positions it or its attorney takes, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The defendant also has the right to provide information concerning the offense and to make recommendations to the Court and the United States Probation Office.

15. **Parties to the Agreement.** The defendant understands this plea agreement binds only it and the United States Attorney for the District of Kansas and ECS, and that it does not bind any other federal, state, or local prosecution authority.

16. **No Other Agreements.** The defendant has had sufficient time to discuss this case, the evidence, and this plea agreement with its attorney and it is fully satisfied with the advice and representation its attorney provided. Further, the defendant acknowledges that it authorized its representative to enter into this agreement after its Board of Directors reviewed and approved the terms of this plea agreement, that it understands the terms of this Plea Agreement, and agrees it is

11

true and accurate and not the result of any threats, duress or coercion. The defendant further understands that this plea agreement supersedes any and all other agreements or negotiations between the parties, and that this plea agreement embodies each and every term of the agreement between the parties.

17. The defendant acknowledges that it is entering into this plea agreement and is pleading guilty because it is guilty. It further acknowledges that it is entering its guilty plea freely, voluntarily, and knowingly.

_____  Date: 11-4-21
Alan G. Metzger
Assistant United States Attorney

_____  Date: 11/2/2021
Aaron L. Smith
Assistant United States Attorney
Supervisor

Carrie N. Capwell
Digitally signed by Carrie N. Capwell
Date: 2021.10.28 17:26:15 -05'00'

_____  Date: _____
Carrie Capwell
Criminal Chief

_____  Date: 10/29/2021
R.J. Powers
Trial Attorney
Environmental Crimes Section


_____  Date: _____
Gary L. Ayers
Foulston Siefkin LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, KS 67206
316.291.9530
gayers@foulston.com
Counsel for Defendant

12

true and accurate and not the result of any threats, duress or coercion. The defendant further understands that this plea agreement supersedes any and all other agreements or negotiations between the parties, and that this plea agreement embodies each and every term of the agreement between the parties.

17.   The defendant acknowledges that it is entering into this plea agreement and is pleading guilty because it is guilty. It further acknowledges that it is entering its guilty plea freely, voluntarily, and knowingly.

_____   Date:_____
Alan G. Metzger
Assistant United States Attorney

_____   Date: 11/2/2021
Aaron L. Smith
Assistant United States Attorney
Supervisor

_____   Date:_____
Carrie Capwell
Criminal Chief

_____   Date:_____
R.J. Powers
Trial Attorney
Environmental Crimes Section

_____   Date: 10-28-21
Gary L. Ayers
Foulston Siefkin LLP
1551 N. Waterfront Pkwy, Suite 100
Wichita, KS 67206
316.291.9530
gayers@foulston.com
Counsel for Defendant

12

Defendant Airosol Company, Inc.

By _____
Eugene Fleishman, President

13